UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X

J.L., a minor child, by his father and                                    09 Civ. _____ (      ) (ECF CASE)
natural guardian, ROBERT SULLIVAN,

                                        *Plaintiff,*                       **COMPLAINT**

                           - against -                                    **<u>ORDER TO SHOW CAUSE</u>
                                                                          <u>REQUESTED</u>**

MOHAWK CENTRAL SCHOOL DISTRICT;
JOYCE CAPUTO, Superintendent of Mohawk Central                            **JURY DEMAND**
School District; EDWARD RINALDO,
Principal of Gregory B. Jarvis Junior/Senior High
School; CYNTHIA STOCKER, Equal Opportunity
Compliance Officer,

                                        *Defendants.*
------------------------------------------------------------------ X

   J.L., a minor child, by his father and natural guardian Robert Sullivan, brings this civil

rights action to redress the severe, persistent and violent harassment J.L. has experienced at

school based on his sex and sexual orientation in violation of his federal and state rights.

## <u>PRELIMINARY STATEMENT</u>

   1.  This case involves a school district's failure to keep safe one of its students, J.L.,

a fourteen-year-old rising ninth grader in the Mohawk Central School District at Gregory B.

Jarvis Junior/Senior High School ("Jarvis High"). J.L. has been targeted with verbal harassment,

threats and physical violence on account of sex, because he does not conform to stereotypical

notions of how teenage boys should act and appear, and on account of sexual orientation,

because he is gay. Students have hurled slurs like "pussy," "faggot," "queer," "homo,"

"cocksucker," and "bitch"; thrown food at, kicked, tripped and shoved J.L., once causing a

sprained ankle that put J.L. on crutches; and threatened to beat, stab or murder J.L. A student

once brandished a knife to punctuate the threat and promised to hang his "faggot ass" up the flagpole.

2.     This harassment is about both J.L.'s sexual orientation and the fact that he does not conform to stereotypes about what boys of his age should look like and how they should behave.  Both before and after J.L. came out as gay at school, students would tell him to get a sex change operation because he was so "girly" and aggressively mocked him for dyeing his hair, wearing eye makeup, and speaking with a high-pitched voice.  After J.L. came out, the level of bullying and threats intensified, particularly by a group of repeat offenders who have been allowed by the school to engage in a campaign of bullying against J.L. without effective reprimand or discipline.  Even teachers have been involved in promoting this climate of harassment.

3.     Despite J.L. and his family members' repeated notice to School District officials about this situation and the marked toll it has taken on J.L.'s academic success and emotional state, Defendants have done virtually nothing to ensure that J.L. is educated without fearing for his personal safety and enduring daily humiliation.  Indeed, Defendants have not followed their own established procedures for handling and investigating complaints and for disciplining students involved in the harassment.

4.     By the end of the last academic year, J.L. and his parents were so fearful for his safety that he stopped attending school.  School District officials simply raised their hands and turned their backs on this vulnerable student, encouraging J.L. to leave school rather than addressing the harassment directly.

5.     Accordingly, Plaintiff seeks a declaratory judgment, preliminary and permanent injunctive relief, and compensatory and punitive damages to remedy violations of the Equal

Protection Clause of the Fourteenth Amendment of the United States Constitution, pursuant to 42 U.S.C. § 1983; Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*; Section 296 of the New York Human Rights Law; Sections 40-c and 40-d of the New York Civil Rights Law; and New York common law.

<u>JURISDICTION AND VENUE</u>

6.      This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §§ 1331 and 1343 because the matters in controversy arise under the Constitution and laws of the United States.  This Court has supplemental jurisdiction over related state law claims under 28 U.S.C. § 1367(a) because those claims arise out of the same case or controversy as the federal claims.

7.      Venue is proper in this court under 28 U.S.C. § 1391(b) because the events that give rise to Plaintiff's claims took place in the Northern District of New York.

<u>PARTIES</u>

<u>Plaintiff</u>

8.      Plaintiff J.L. is a fourteen-year-old resident of Herkimer County and a citizen of the State of New York.  He has been a student in Mohawk Central School District since September 2005 and at the Gregory B. Jarvis Junior/Senior High School ("Jarvis High") since September 2007.

<u>Defendants</u>

9.      Defendant MOHAWK CENTRAL SCHOOL DISTRICT is an education corporation and association in Herkimer County, New York, existing pursuant to New York Education Law.  The School District is a "person" within the meaning of 42 U.S.C. § 1983. Upon information and belief, the School District and each of its component schools are recipients of federal financial assistance.  The School District is non-sectarian and exempt from

taxation pursuant to § 408 of New York's real property tax.  Jarvis High is a school in the School District.

10.      Defendant JOYCE CAPUTO, sued in both her official and individual capacities, is the current Superintendent of the School District.  Ms. Caputo has been the Superintendent of the School District at all times that J.L. has been a student there.

11.      Defendant EDWARD RINALDO, sued in his official and individual capacities, is the current principal of Jarvis High.  Principal Rinaldo has held that position at all times that J.L. has been a student at the school.

12.      Defendant CYNTHIA STOCKER, sued in her official and individual capacities, is the Director of Student Services and the designated Equal Opportunity Compliance Officer for the School District.

## STATEMENT OF FACTS

### J.L. Has Experienced Severe, Pervasive, and Violent Harassment at School Based on his Sex and Sexual Orientation.

13.      Since arriving at Jarvis High, J.L.'s classmates have bullied and harassed him because of his sex—specifically his failure to conform to sex stereotypes about what a boy should look like and how he should behave—and later, after he came out as a gay male, because of his sexual orientation as well.

14.      Throughout his seventh grade year in 2007-2008, J.L. was regularly called "bitch" and "pussy" and on various occasions students told him he should get a sex change operation because he was so "girly."

15.      Both J.L. and his father separately informed Principal Rinaldo about these comments.  Principal Rinaldo promised to look into the harassment, but never told J.L. or his father whether he had taken any steps to investigate and respond to these incidents.  Upon

information and belief, no action was taken to investigate the incident or to address the harassment.

16.     Near the end of seventh grade, while J.L. was changing clothes in a locker room stall after gym class, a group of students accused J.L., in front of the rest of the gym class, of masturbating to gay pornography in the stall.

17.     J.L.'s father reported the incident to Principal Rinaldo in person.  Principal Rinaldo stated that he would look into the incident.  After not hearing back from Principal Rinaldo, J.L.'s father called to follow up.  Principal Rinaldo indicated that he had spoken to the students involved, but did not give J.L.'s father any other information.  Upon information and belief, no action was taken to investigate the incident further or to address the harassment.

18.     Also near the end of that year, a student grabbed J.L.'s iPod from him, stepped on it so that it broke, and threw it over the railing of the school stairs.

19.     At the end of J.L.'s seventh grade year, J.L.'s father asked Principal Rinaldo if the school would take steps to address this pattern of harassment.  Principal Rinaldo responded that the harassment would resolve itself and stated something to the effect of "boys will be boys."

20.     The harassment did not resolve itself.  In fact, it escalated.  On a regular basis during the following academic year, students continued to harass J.L. because of his sex—specifically his failure to conform to sex stereotypes—by calling him names like "pussy" and "bitch" and teasing him for dyeing his hair, wearing eyeliner, and speaking in a way that was perceived to be effeminate.

21.     Students also commonly hurled anti-gay epithets at J.L. such as "gay," "faggot," "homo," and "cocksucker," made obscene gestures at J.L., and spread rumors about him engaging in sexual activity with other male students.

22.     In addition to the verbal harassment, J.L. was subjected to destruction of his property, physical intimidation, and actual violence.  Students defaced and destroyed J.L.'s belongings, writing offensive insults on his shoes, and throwing his clothing in a trash can. Students threatened to beat, stab, and even kill J.L. in addition to tripping, shoving, and pushing him, on one occasion causing serious injury.

23.     For example, on the first day of the 2008-2009 term, one of J.L.'s classmates shoved him into a row of lockers.  J.L.'s father called Principal Rinaldo, who said he would look in to the incident.  Principal Rinaldo never told J.L.'s father whether he took any action regarding this complaint.  Upon information and belief, no action was taken to investigate the incident or to address the harassment.

24.     Shortly after the first day of school, a student grabbed J.L.'s cell phone and stepped on it, breaking it.

25.     In October 2008, J.L.'s lock on his gym locker was removed along with his clothes.  J.L. found his clothes and shoes in a trash can with the word "faggot" and the message "I hope you die" written on the shoes.

26.     J.L. immediately reported the incident to his gym teacher and his father.  J.L.'s father went to the school to meet with Principal Rinaldo in person and discuss the incident. Principal Rinaldo responded that he could not "babysit" every student in the school and promised to replace J.L's stolen gym lock.  J.L. was never given a new lock.  Upon information and belief, no action was taken to investigate the incident or to address the harassment.

27.     That fall, J.L.'s father asked Principal Rinaldo if he could change J.L.'s class schedule so that he was not in any classes with one of the students who harassed him most frequently.  Principal Rinaldo refused to consider the request.

28.    In November 2008, a student pushed J.L. down the stairs, which resulted in J.L. falling and spraining his ankle.

29.    A few weeks later, while J.L. was still on crutches, a student attempted to trip him in the hallway.

30.    J.L.'s father reported this incident to Principal Rinaldo, whose only response was that he would let J.L. use the school's elevator because he was injured.  Upon information and belief, no action was taken to investigate the incident or to address the harassment.

31.    That same month a student whose locker was near J.L.'s pushed the books out of J.L.'s hands and kicked him in the shins.  This same student proceeded to refer to J.L. as "faggot" and "cocksucker" throughout the year.

32.    Also in November, the same student who tripped J.L. approached him in the lunch room and stated something to the effect of, "I'm glad your dad has cancer, I hope he dies soon, he's probably a faggot, too, so why don't I go suck him off."  After a brief shoving match between the two boys, J.L., understandably angered by this insensitive comment, hit the other student.  Both students were sent to the principal's office, where J.L. was given a suspension and detention and ordered to eat lunch with his tormenter.  Upon information and belief, the other student was not punished.

33.    In response to these various incidents, J.L.'s father initiated yet another meeting with Principal Rinaldo to discuss a comprehensive plan to ensure J.L.'s safety.  At J.L.'s father's request, Principal Rinaldo agreed to exempt J.L. from the school's no-cell-phone policy and to designate a "safe room" for J.L. to go to when he felt unsafe or threatened.

34.    Subsequent to that meeting, J.L. had his cell phone taken away from him on numerous occasions by school staff despite Principal Rinaldo's promise.  Principal Rinaldo told

J.L.'s father he would look in to why the school staff was not allowing J.L. to use his cell phone. However, J.L.'s father never heard back from Principal Rinaldo and staff and teachers continued to prevent J.L. from using his phone to call his father throughout the year.

35.     J.L. also was prevented from using the "safe room" by teachers who stopped him when he left class and forced him to return rather than proceed to the room.

36.     In December 2008, some students pushed J.L. on the school stairs such that he almost fell over the railing.

37.     J.L.'s father, mother, sister, and J.L. met with Principal Rinaldo to discuss this incident.  Despite Principal Rinaldo's assurances that he would investigate the incident, he failed to respond to repeated requests for information and updates from J.L.'s family.  Upon information and belief, no action was taken to investigate the incident or to address the harassment.

38.     Also that December, Fred Hartmann, J.L.'s science teacher, pulled J.L. aside in the hall and told J.L. he should be ashamed of himself for being gay and said words to the effect that J.L. should "hate himself every day until he changed."

39.     J.L.'s father met with Principal Rinaldo to discuss the anti-gay comments Fred Hartmann made towards J.L.  Without investigating, Principal Rinaldo immediately told J.L.'s father that Mr. Hartmann, a long time teacher at the School, would not have engaged in such behavior.  Upon information and belief, no action was taken to investigate the incident or to discipline or counsel Mr. Hartmann.

40.     J.L. also suffered throughout the school year in the cafeteria, where several students often threw food at him.  On one occasion, a student approached J.L. in the cafeteria, threw a banana at him and said, "here, now you don't need a boyfriend, suck on that."

41.     J.L.'s father met with Principal Rinaldo to discuss the problem of students throwing food at J.L. in the cafeteria.  In the meeting Principal Rinaldo expressed disbelief that this was happening, but J.L.'s father told Principal Rinaldo that there were other students who had witnessed this bullying.  Principal Rinaldo responded with words to the effect of "of course his gay friends are going to defend him."  Upon information and belief, Principal Rinaldo did not speak to or discipline the students involved in the harassment, who continued to torment J.L. by throwing food at him after that meeting.

42.     J.L.'s father also asked Principal Rinaldo to address the incident involving the banana.  When J.L.'s father went to the school to talk to him, Principal Rinaldo responded that it was not his job to cater to homosexuals.  Upon information and belief, no action was taken to investigate the incident or to address the incident.

43.     In April 2009, one of J.L.'s most frequent harassers approached J.L. in the lunch room, said words to the effect of "It's Adam and Eve, not Adam and Steve" and "if you don't die I'll make the world's dream possible," which J.L. understood as a death threat.

44.      J.L.'s father reported this incident to Principal Rinaldo and also told him that students often waited outside school to beat up J.L. when he exited.  Principal Rinaldo responded that he would look into the issue, but suggested that rather than tell him of these incidents J.L.'s father should inform the police.  Upon information and belief, no action was taken to investigate the incident or to address this harassment.

45.     Similarly, in May 2009 a student approached J.L. in technology class and made several comments such as: "lose the makeup, lift weights, lose the faggot voice and start liking girls" and "you're a disgrace to the human race.  Do the world a big favor and die because no one would miss you."

46.    J.L.'s father reported this incident to Principal Rinaldo.  Upon information and belief, no action was taken to investigate the incident or to address the incident.  After that day, the same student repeatedly harassed J.L. and made sexist and anti-gay comments towards him.

47.    In June of 2009, J.L.'s mother and sister accompanied him to a concert held in the school.  While they were across from the school, on their way to the concert, a student ran up to them making a gesture as though he was going to hit J.L. and yelled "tell your faggot son to keep away from me" and "when I catch your son alone I'm going to kick his ass."

48.    J.L. and his family met with Principal Rinaldo to discuss the incident.  Principal Rinaldo stated that there was nothing he could do to address the situation because the incident occurred in the park outside of the school rather than on school property.  Upon information and belief, no action was taken to investigate the incident or to address the incident.

49.    The harassment culminated on June 5, 2009, when a student, who had been named numerous times in reports to Principal Rinaldo, threatened to kill J.L.  The student brought a knife to school, showed it to J.L. during class, and threatened to stab J.L. and string his "faggot ass" up from the flagpole.  J.L., afraid for his life, left the school and went home.

50.    Ms. Stocker, the Equal Opportunity Compliance Officer, called J.L.'s father later that day to report that J.L. left the school without permission.  J.L.'s father immediately went to the school and spoke to her.  Ms. Stocker indicated that despite the death threat against J.L., the school could not take any steps to investigate the situation or protect J.L. because there had not been an incident of actual physical violence.  J.L.'s father asked to speak to Principal Rinaldo but was told that Principal Rinaldo knew about the incident but had left school to accompany some students on a field trip.

51.     Despite her responsibilities as Equal Opportunity Compliance Officer, Ms. Stocker did not take a formal complaint regarding this incident, did not initiate a full investigation, and did not issue any findings or inform J.L. or his family about any response to this incident.

52.     A few days later, J.L.'s father went to the school and again insisted on speaking with Principal Rinaldo about how he planned to protect J.L. from harassment, threats, and violence.  Principal Rinaldo admitted that he could not guarantee J.L.'s safety and that the harassment would probably carry over into next year.  He told J.L.'s father that home-schooling might be safer than allowing J.L. to continue attending Jarvis High.  Principal Rinaldo did not offer any alternative solutions to ensure J.L.'s ability to return to school.  At this meeting, Principal Rinaldo and J.L.'s father agreed that in order to protect his safety, J.L. would not attend school for the remainder of the school year except to take his final exams.

53.     J.L. did not attend school for the remainder of the school year except to take his exams, thus missing the last two weeks of school.

### J.L. Has Suffered Physically, Emotionally, and Academically as a Result of this Pattern of Severe and Pervasive Harassment

54.     Rather than being able to view attending school as a pleasant and safe educational opportunity, J.L. dreads each day in school because of the constant humiliation and fear he experiences as a result of the pattern of severe and pervasive sex and sexual orientation-based harassment alleged above.

55.     This pattern of harassment has impaired J.L.'s ability to obtain educational benefits and advancement.  J.L.'s grades dropped over the course his eighth grade year because of the Defendants' failure to address the escalating harassment.

56.     J.L. also missed many days of class, including missing the last two weeks of class altogether, thus directly impairing his education.

57.     Because of the harm to his academic record, J.L. was forced to forgo obtaining a summer job in order to attend summer school, thus depriving him of a valuable experience and depriving him and his family of income.

58.     J.L.'s stepmother had to begin to work a night shift, and J.L.'s father had to miss many medical appointments and meetings in order to transport J.L. to and from the summer school, located in a different town from where J.L.'s family lives.

59.     J.L. has also suffered and continues to suffer emotional distress and humiliation because of the harassment he has been forced to endure.

60.     J.L. has also suffered actual physically injury from being pushed down the stairs, kicked, and shoved into lockers and other objects by students as part of a pattern of sex and sexual orientation-based harassment.

61.     J.L. also suffered the loss of his personal property, including an iPod, a cell phone, and some clothing, all of which were maliciously destroyed by students as part of that same pattern of harassment.

62.     Defendants' unlawful and discriminatory acts and omissions were the direct and proximate cause of the harms alleged herein.

### Defendants Have Been Deliberately Indifferent to the Pattern of Severe and Pervasive Harassment Suffered by J.L.

63.     Defendants failed to undertake any meaningful investigative, disciplinary, preventative, remedial or corrective measures in response to this pattern of sexist and anti-gay harassment against J.L., despite the ability and authority to do so on behalf of the School District.

This failure to act despite actual knowledge that J.L. was being harassed departed from the District's own established procedures for dealing with harassment and discrimination.

64.     Principal Rinaldo had actual knowledge that J.L. was suffering from severe and pervasive harassment because he did not conform to sex stereotypes and because he was gay or perceived to be gay.  Over the course of the past year alone, J.L.'s father called Principal Rinaldo over five times and spoke to him in person at least ten times regarding the incidents and threats alleged above.  Additionally, J.L.'s mother and stepmother spoke with Principal Rinaldo at least six times each over the phone or in person about these issues.

65.     Upon information and belief, Principal Rinaldo has not taken any meaningful or effective steps to address the severe and pervasive sex and sexual orientation-based harassment J.L. has experienced at Jarvis High.

66.     Principal Rinaldo currently has—and has had at all relevant times while J.L. was a student at the School—final policymaking authority for the School District with respect to the day-to-day enforcement of equal opportunity, anti-harassment, and anti-bullying policies at Jarvis High, including the school's code of conduct.  This includes the responsibility to redress complaints of discrimination and harassment, discipline perpetrators, and forward complaints to appropriately designated individuals in the School District.

67.     Ms. Stocker had actual notice that J.L. was suffering from harassment because he did not conform to sex stereotypes and because he was gay or perceived to be gay.

68.     Upon information and belief, Ms. Stocker has not taken any meaningful or effective steps to address the sex and sexual orientation-based harassment J.L. has experienced at Jarvis High.

69.     As Compliance Officer, Ms. Stocker is responsible for investigating complaints regarding discriminatory harassment on the basis of, among other things, sex and sexual orientation. At all relevant times Ms. Stocker had the duty and authority to investigate complaints of harassment and issue reports of her findings to the Superintendent.

70.     Superintendent Caputo had actual knowledge that J.L. was suffering from severe and pervasive harassment because he did not conform to sex stereotypes and because he was gay or perceived to be gay. Over the course of the past year alone, J.L.'s parents called Superintendent Caputo at least ten different times when they had not received a response from the school regarding investigations of or responses to incidents of harassment.

71.     According to the School District's Code of Conduct, Superintendent Caputo is responsible for promoting a safe, orderly and stimulating school environment and for reviewing with district administrators the policies of the Board of Education and state and federal laws relating to school operations and management. Superintendent Caputo has the authority to work with district administrators in enforcing the code of conduct and assuring that all claims of harassment are resolved promptly and fairly. Ms. Caputo is also responsible for creating instructional programs that decrease instances of misconduct and are sensitive to student and teacher needs.

72.     Upon information and belief, Superintendent Caputo had the ability and authority to take corrective action on behalf of the School District to stop the discrimination and harassment of J.L., to discipline perpetrators of such discrimination and harassment and to forward his complaints of harassment to the appropriately designated individuals.

73.     The School District's "Discriminatory Harassment Complaint Procedure" requires the School District to publish a Statement of Nondiscrimination in the staff and student

handbooks and newsletters, as well as to post it in appropriate locations.  The Statement of Nondiscrimination is to explain the District's anti-discrimination policies and procedures, explain complaint procedures, and provide the name, address, and telephone number of the district's Equal Opportunity Compliance Officer.

74.     Defendants failed to include any of this information in the School's Parent-Student handbook and, upon information and belief, failed to make it available to parents and students through any other means.

75.     Despite repeated complaints to District officials about the harassment J.L. was experiencing, neither J.L. nor his parents were ever informed of the existence of Ms. Stocker, the School's Equal Opportunity Compliance Officer, prior to the day she phoned J.L.'s father on June 5, 2008, nor were they told that an anti-harassment policy and grievance procedure existed.

76.     Upon information and belief, Defendants never forwarded the complaints about harassment of J.L. to the School District's designated Compliance Officer as required by Superintendent Policy #7531, "Sexual Harassment of Students."

77.     The School District's anti-harassment policy also requires the Compliance Officer to consult with the Superintendent and/or counsel upon receiving a verbal or written complaint of discriminatory harassment.

78.     Upon information and belief, neither Principal Rinaldo nor Compliance Officer Stocker consulted with Superintendent Caputo regarding incidents of harassment of J.L. at the appropriate times.

79.     The School District's anti-harassment policy requires the Compliance Officer to interview all relevant persons involved in a complaint of harassment, "including the complainant, the accused, eyewitnesses, and potential corroborating witnesses."

80.     At no time during the year did any school official ever interview J.L. about any of the reported incidents of harassment for the purpose of investigating those incidents.

81.     Many of J.L.'s classmates who witnessed incidents of harassment and threats against J.L. were never interviewed as witnesses by any school official.

82.     At the end of an investigation into an allegation of discrimination or harassment, the Compliance Officer is required to draft a final report that is issued to the Superintendent. After it is determined whether the complaint is valid, the Anti-Harassment Policy requires the School District to notify the complainant of the results of the investigation and of any remedial action taken.

83.     Despite repeatedly asking Defendants for a response to his complaints, neither J.L. nor his family was ever informed whether any investigation was undertaken, the results of any such investigation, or whether any remedial action was taken.

84.     Upon information and belief, the acts and omissions of discrimination and harassment committed by School District employees alleged herein reflected, and were made pursuant to, policies and practices of the School District.  These acts and omissions were sufficiently persistent so as to constitute a custom of the School District with the force of and were so manifest to imply the acquiescence of senior policy-making officials.

85.     Upon information and belief, neither the School District nor any of the School District's officials, policy makers, administrators, or other employees provided, at any time relevant to this Complaint, appropriate training to administrators, faculty, or staff with respect to discrimination, harassment, or bullying based on sex or sexual orientation.  This failure has occurred despite actual knowledge by relevant policy makers, officials, administrators, and employees of the prevalence of sexist and anti-gay discrimination and harassment by School

District students and employees.  The failure to provide training is a direct and proximate cause of the School District's employees' discrimination against and harassment of J.L. and their failure to adequately address the harassment against him perpetrated by others.

86.     At all relevant times all Defendants were acting under color of state law.  At all relevant times the Defendants who are employees the School District were acting within the scope of their employment.

## JURY DEMAND

87.     Plaintiff demands a trial by jury on all issues pursuant to the Seventh Amendment to the United States Constitution and Rule 38 of the Federal Rules of Civil Procedure.

## FIRST CLAIM FOR RELIEF

### U.S. Constitution Amendment XIV
### Denial of Equal Protection on the Basis of Sex and Sexual Orientation

(Brought by J.L. Pursuant to 42 U.S.C. § 1983 Against the School District, Superintendent Caputo, Principal Rinaldo, and Ms. Stocker in their official and individual capacities)

1.     The acts and omissions of the Defendants, described above, violated J.L.'s clearly established rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

## SECOND CLAIM FOR RELIEF

### Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq*.
### Discrimination Based on Sex

(Brought by J.L. Against the Mohawk Central School District)

2.     The acts and omissions by the School District, described above, violated J.L.'s rights under Title IX by discriminating against him on the basis of sex.

## THIRD CLAIM FOR RELIEF

**New York Human Rights Law, New York Executive Law § 296(4)**
**Discrimination on the Basis of Sex and Sexual Orientation**

(Brought by J.L. Against the Mohawk Central School District)

3.      The acts and omissions of the School District, described above, denied J.L. the use of School District facilities and permitted harassment on him on the basis of sex and sexual orientation, in violation of New York Human Rights Law § 296(4).

## FOURTH CLAIM FOR RELIEF

**New York Human Rights Law, New York Executive Law § 296(6)**
**Discrimination on the Basis of Sex and Sexual Orientation**

(Brought by J.L. Against Superintendent Caputo, Principal Rinaldo, and Ms. Stocker in their individual capacities)

4.      The acts and omissions of the individual Defendants, described above, aided, abetted, incited, compelled and/or coerced the harassment of J.L. on the basis of sex and sexual orientation, in violation of New York Human Rights Law § 296(6).

## FIFTH CLAIM FOR RELIEF

**New York Civil Rights Law §§ 40-c and 40-d**
**Discrimination on the Basis of Sex and Sexual Orientation**

(Brought by J.L. Pursuant to the New York Human Rights Law Against Mohawk Central School District, Superintendent Caputo, Principal Rinaldo, and Ms. Stocker in their individual capacities)

5.      The acts and omissions of the Defendants, described above, subjected J.L. to discrimination on the basis of sex and sexual orientation in violation of New York Civil Rights Law §40-c.

6.     The acts and omissions of the individual Defendants, described above, aided and incited unlawful discrimination by others against J.L. on the basis of sex and sexual orientation in violation of New York Civil Rights Law § 40-d.

7.     Plaintiffs have complied with the requirements of New York Civil Rights Law § 40-d by serving notice upon the state attorney general.

## SIXTH CLAIM FOR RELIEF

### Negligent Supervision

(Brought by J.L. Pursuant to New York law Against Mohawk Central School District, Superintendent Caputo, Principal Rinaldo, and Ms. Stocker in their individual capacities)

8.     At all times the Defendants had a duty to exercise the same degree of care over the pupils, including J.L., under its control as would a reasonably prudent parent.

9.     The acts and omissions of Defendants, described above, breached that duty.

10.     As a result, J.L. suffered the injuries described above.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff J.L. requests judgment in his favor and requests relief against Defendants as follows:

1.     A declaration that the Defendants violated J.L.'s legal rights.

2.     A permanent injunction requiring the Mohawk Central School District to take appropriate steps to remedy the deprivation of J.L.'s rights;

3.     An immediate preliminary injunction to ensure J.L.'s safety and ability to receive educational services prior to the commencement of school on September 8, 2009;

4.     Compensatory damages against defendants Mohawk Central School District, Superintendent Caputo, Principal Rinaldo, and Ms. Stocker for violations of the Fourteenth Amendment to the U.S. Constitution;

5.      Compensatory damages against defendant Mohawk Central School District for violations of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*;

6.      Compensatory damages and other appropriate relief against defendants Mohawk Central School District, Superintendent Caputo, Principal Rinaldo, and Ms. Stocker for violations of the New York Human Rights Law;

7.      Statutory damages against defendants Mohawk Central School District, Superintendent Caputo, Principal Rinaldo, and Ms. Stocker for violations of the New York Civil Rights Law;

8.      Compensatory damages against defendant Mohawk Central School District for violations of New York common law;

9.      Punitive damages against defendant Mohawk Central School District for violations of New York common law;

10.     Punitive damages against defendants Superintendent Caputo, Principal Rinaldo, and Ms. Stocker for violations of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution;

11.     Attorney's fees and costs incurred in the prosecution of this action pursuant to, *inter alia*, 42 U.S.C. § 1988 and other applicable laws;

12.     Any other relief the court may deem just and proper.


_____/s/ Corey Stoughton_____
Corey Stoughton (Bar Roll No. 513810)
Ami Sanghvi*
Matthew Faiella*
Naomi R. Shatz*
Arthur Eisenberg (Bar Roll No. 101576)
Chris Dunn (Bar Roll No. 513828)
*Attorneys for Plaintiff*

NEW YORK CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St., 19th Floor
New York, N.Y. 10004
Tel: (212) 607-3300
Fax: (212) 607-3326


*Admission pro hac vice pending.*

Dated:  August 18, 2009
        New York, NY